IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | | |
|---|---|---|---|
| The Inclusive Communities Project, Inc., | * | | |
|      Plaintiff, | * | | |
| v. | * | No. 3:17-cv-440 | |
| | * | | |
| Governor Greg Abbott only in his | * | | |
| official capacity as Governor of | * | | |
| The State of Texas, | * | | |
|      Defendant. | * | | |
| | * | | |

<u>COMPLAINT</u>

**Summary**

1. The Texas statute outlawing municipal ordinances that prohibit discrimination against recipients of federal housing vouchers is Tex. Local Gov't Code § 250.007 (the "Statute"). The Statute became effective September 1, 2015. The Statute violates the 14th Amendment to the United States Constitution and the Fair Housing Act sections 42 U.S.C. § 3604(a), and 42 U.S.C. § 3615.

2. Dallas area voucher households are concentrated in minority areas of the City of Dallas. Most of the multifamily landlords with units that can be rented at voucher program rents in White non-Hispanic areas refuse to rent to voucher households. There is an unmet demand by voucher households for dwelling units in these areas. The multifamily landlords with units that can be rented at voucher program rents and that rent to voucher households are disproportionately located in predominantly minority areas.

3. Ordinances and laws prohibiting discrimination against voucher participants lessen racial segregation and make more units available in White areas to Black families using

vouchers. In 2015, the State of Texas passed the challenged Statute to outlaw these ordinances that make units available in White areas for voucher households. The Statute explicitly permits multifamily landlords to deny housing to voucher families who can pay the rent, satisfy the tenant selection criteria, and for whom there are no legitimate business reasons not to accept as tenants. By permitting the multifamily landlords in White areas to discriminate solely on the basis of participation in the voucher program, the Statute excludes the predominantly Black voucher households from White areas. The Statute segregates those households in minority concentrated areas that are marked by conditions unequal to the conditions in the areas from which they are excluded. The Statute has the intent and the effect of perpetuating racial segregation.

4. Plaintiff Inclusive Communities Project, Inc. (ICP) helps Black voucher households gain access to housing in low poverty, non-racially concentrated locations in the Dallas metropolitan area. The Statute makes it more difficult and more expensive for ICP to obtain housing for its voucher clients in areas of low poverty and high opportunity.

**Jurisdiction**

5. The Court has jurisdiction pursuant to 42 U.S.C. § 3613(a)(1)(A) and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

**Plaintiff**

6. Plaintiff Inclusive Communities Project, Inc. (ICP) is a fair housing focused nonprofit organization working with households seeking access to housing in predominately non-minority locations in the Dallas area. As part of its mission, ICP provides counseling, financial assistance, and other services to Black or African American households participating in the Section 8 Housing Choice Voucher (HCV or voucher) Program administered by the Dallas Housing

Authority (DHA).

7. Approximately 86% of the DHA voucher participants are Black or African American. ICP assists DHA voucher households who choose to lease dwelling units in non-minority areas with counseling and financial assistance. ICP also operates its sublease/guarantor program for its clients. ICP's office is located in the City of Dallas, Dallas County, Texas. ICP's clients are Black or African American. ICP's clients are predominantly families with children.

8. ICP is organized to work for the creation and maintenance of thriving racially and economically inclusive communities, the expansion of fair and affordable housing opportunities for low income families, and redress for policies and practices that perpetuate the harmful effects of discrimination and segregation. ICP operates to create and obtain affordable housing in non-minority concentrated areas within the Dallas metropolitan area for persons eligible for low income housing including voucher households. This includes, among other means, providing the counseling and other forms of assistance to voucher households seeking to utilize their housing choice voucher to move into those areas in the City of Dallas and throughout the Dallas metropolitan area.

9. ICP focuses its housing mobility counseling and financial assistance resources on helping households find housing in higher opportunity areas with lower poverty rates, higher median family income, and higher ranking public schools.

10. ICP's assistance to its DHA voucher clients is part of the remedy in the *Walker v. HUD* public housing desegregation case. The U.S. Court of Appeals for the Fifth Circuit recommended a desegregation plan to remedy the intentional segregation of public housing and Section 8 vouchers by the Federal government, the City of Dallas, and the Dallas Housing

Authority. The plan included a housing voucher mobility program. The Fifth Circuit held that this remedy should include more vouchers and a vigorous mobility program that served the Black voucher households wishing to move out of the segregated areas. *Walker v. City of Mesquite*, 169 F.3d 973, 985, 987-988 (5th Cir. 1999), *cert. denied*, 528 U.S. 1131 (2000). The United States District Court adopted the housing mobility program as part of the remedy. ICP has been providing housing mobility services to its DHA voucher clients since 2005.

    11. The housing mobility assistance given by ICP to all DHA voucher participants begins with providing mobility counseling information to the voucher participants as they attend DHA's mandatory voucher briefings. After the briefings, ICP provides additional mobility assistance as requested by the households who want to make and sustain a move to a high opportunity area. This help includes pre-move mobility counseling and related financial assistance. The housing mobility assistance also includes negotiating with landlords as necessary to obtain units in the eligible areas at rents that are affordable by the voucher households and eligible for the voucher subsidy. The financial assistance ICP provides to these households may include the payment of application fees and security deposits to assist households moving into housing that provides opportunities in non-predominantly minority, non-poverty concentrated areas. ICP can also make landlord incentive bonus payments to landlords in areas that provide housing opportunities in non-predominantly minority, non-poverty concentrated areas who agree to participate in DHA's voucher program. ICP makes these payments when it determines that such incentives are necessary to secure housing for the voucher households. For example, ICP may provide a reasonable bonus payment to a landlord if it is necessary to obtain a rent concession in order for a unit to be eligible for voucher assistance at a rent affordable to the family or if the bonus payment

is necessary to convince a landlord to participate in DHA's voucher program.

12. ICP also offers landlords in high opportunity areas the option of contracting with ICP to serve either as a guarantor for DHA voucher households or as the sublessor for DHA voucher households. Each of these contractual alternatives may include a landlord incentive bonus paid by ICP.

13. ICP obtained a change in the Fair Market Rents in the Dallas area as a result of litigation against HUD. For the last six years, HUD has set voucher rents by Zip Code in the Dallas area. These changes increased the number of multifamily units that were available at market rents to voucher holders in White non-Hispanic Zip Codes. The higher Zip Code rents eliminated one of the reasons that has been asserted by multifamily landlords for their policy of refusing to rent to voucher households.

**Additional facts on Standing**

14. A City of Dallas ordinance prohibiting discrimination against voucher households would make more units in majority White non-Hispanic areas available for ICP's clients. The increased number of units would reduce the ICP financial costs and the ICP's counselors' time spent on a per client basis to obtain units in those areas. The increased number of units would reduce the ICP resources expended on unsuccessful attempts by ICP's clients to obtain voucher units outside of racially concentrated areas of high poverty.

15. ICP has a close, essentially representative relationship with its clients. It acts as their agent in locating integrated rental housing and negotiating housing terms. ICP acts as the clients' representative in advocacy involving individual matters with the housing authority. It also acts as the clients' representatives in advocacy involving institutional issues such as the amount of the

fair market rent that can be paid in the Housing Choice Voucher Program. ICP is an integral part of its clients' exercise of their housing-related protections under the civil rights laws. ICP's actions assisting its clients in obtaining racially integrated housing is within the zone of interests of the Fair Housing Act.

16. ICP meets the Fair Housing Act definition of an aggrieved person. 42 U.S.C. § 3602(i). ICP has been injured by Defendants' discriminatory housing practices.

17. ICP's mission is directly connected to the provision of racially integrated housing opportunities and the elimination of racial segregation. The creation of racially integrated housing opportunities and the elimination of racial segregation are purposes of the Fair Housing Act, 42 U.S.C. § 3601.

18. But for the Statute, the City of Dallas would have passed an ordinance prohibiting discrimination against renting to voucher households.

**Defendant**

19. Defendant Governor Greg Abbott is sued in his official capacity as Governor of the State of Texas. Governor Abbott is the chief executive officer of the State of Texas and whose official duties include causing the laws to be faithfully executed.

**Chronology**

20. The City of Dallas is required to formally consider enactment of an ordinance prohibiting voucher discrimination. The City is required to do so because of its Voluntary Compliance Agreement with the U.S. Department of Housing and Urban Development (HUD).The Voluntary Compliance Agreement was signed to resolve the U.S. Department of Housing and Urban Development finding that the City of Dallas had violated Title VI of the

Civil Rights Act of 1964 by, in part, allowing private developers to prohibit the use of vouchers

at City assisted projects. HUD, Findings, pages 19 - 20. As part of the remedy for this finding,

the Voluntary Compliance Agreement states, in part:

> 2. The City Manager and City Attorney will formally introduce to the Dallas city
> council for a public meeting and adoption an ordinance prohibiting source of
> income discrimination, including discrimination against Housing Choice Voucher
> holders. The proposed ordinance shall provide for administrative enforcement
> with damages and penalties for noncompliance if permitted by Texas law. The
> parties agree that Settlement Action 2 shall be complete when the Dallas city
> council formally convenes to publicly consider adoption of such an ordinance. In
> order to verify such completion to HUD, the City shall submit to Gary Sweeney
> a copy of the public record reflecting the city council's consideration and action
> on such an ordinance.

21. The Voluntary Compliance Agreement was signed on November 5, 2014. The

legislation that resulted in the Statute was filed the next month on December 19, 2014.

22. When the City of Dallas passed an amendment to its Fair Housing Ordinance on

October 26, 2016, it took the Statute into account and specifically deferred to the Statute's

limitations on voucher discrimination. The City Ordinance does not prohibit voucher

discrimination. City of Dallas Code Sec. 20A- 3 (21).

23. The City of Austin amended its Fair Housing Ordinance to protect voucher holders

from discrimination in the rental or sale of housing on December 11, 2014. The stated purpose

was to provide a remedy for the concentration of voucher households in only a few parts of the

City. The unwillingness of landlords to rent to voucher holders was cited as a cause of the

concentration. When the Austin City Council directed its City Manager to prepare the ordinance,

it specifically did so as part of the City's federal obligation to affirmatively further fair housing.

The Austin Ordinance amended the City's fair housing code to prohibit landlords from refusing

to rent to prospective tenants on the basis of "source of income," which was defined to include "housing vouchers and other subsidies provided by government or non-governmental entities." Thus, under Austin's ordinance, if a person was otherwise qualified to rent a property, the landlord could not reject that person because part of that person's rent would be paid with a Housing Choice Voucher. The Austin Apartment Association filed a lawsuit challenging the Austin ordinance on December 12, 2014. A week later, S.B. 267, the bill that became Tex. Local Gov't Code § 250.007, was filed for consideration in the January 2015 Texas legislative session.

24. The Statute states, in part:

> Except as provided by this section, a municipality or county may not adopt or enforce an ordinance or regulation that prohibits an owner, lessee, sublessee, assignee, managing agent, or other person having the right to lease, sublease, or rent a housing accommodation from refusing to lease or rent the housing accommodation to a person because the person's lawful source of income to pay rent includes funding from a federal housing assistance program. Tex. Local Gov't Code § 250.007.

25. The legislative record contains statements by State legislators explicitly taking the City of Dallas obligation to consider a voucher discrimination ordinance and the City of Austin enactment of such an ordinance into consideration as factors supporting the enactment of the Statute.

26. After the Statute was enacted, the City of Dallas drafted and considered an ordinance prohibiting voucher discrimination. The City of Dallas City Council simultaneously considered two versions of the ordinance. One version prohibited voucher discrimination. The second version did not. The City Council members acknowledged that the Statute controlled as a matter of law and prohibited enactment of an ordinance prohibiting voucher discrimination. The version prohibiting voucher discrimination was not adopted by the City of Dallas.

27. The ordinance enacted by the City of Dallas prohibits housing discrimination based on all sources of income "except as prohibited" by the Statute.

> SOURCE OF INCOME means lawful, regular, and verifiable income from whatever source derived (including housing vouchers and other subsidies provided by government or non-governmental entities, child support, or spousal maintenance), except as prohibited by Texas Local Government Code, Section 250.007, as amended. City of Dallas Code Sec. 20A- 3 (21).
>
> "SEC. 20A-4. DISCRIMINATORY HOUSING PRACTICES.
> (a) A person commits an offense if he, because of race, color, sex, religion, handicap, familial status, [or] national origin, or source of income:
> (1) refuses to negotiate with a person for the sale or rental of a housing accommodation or otherwise denies or makes unavailable a housing accommodation to a person;
> (2) refuses to sell or rent, or otherwise makes unavailable, a housing accommodation to another person after the other person makes an offer to buy or rent the accommodation; or
> (3) discriminates against a person in the terms, conditions, or privileges of, or in providing a service or facility in connection with, the sale or rental of a housing accommodation. City of Dallas Code Sec. 20A- 4 (a).

28. The Statute prohibits protection only for persons whose lawful source of income to pay rent includes funding from a federal housing assistance program. Tex. Local Gov't Code § 250.007.

29. Ordinances and laws prohibiting discrimination against voucher participants lessen racial segregation and make more units available in White non-Hispanic areas to Black families using vouchers. If the City of Dallas passed a voucher protection law, landlord compliance with the law would make available more units that can be rented at voucher program rents in majority White non-Hispanic areas.

30. In addition to the City of Dallas, other municipalities and counties in the Dallas area are subject to the federal Community Development Block Grant statutory duty to affirmatively

further fair housing. If any of these jurisdictions enacted voucher protection ordinances, landlord compliance with such ordinances would make available more units that can be rented at voucher program rents in majority White non-Hispanic locations in the Dallas area.

**The Statute violates the disparate treatment standard under the Equal Protection Clause of the 14th Amendment to the U.S. Constitution by intentionally singling out a racially identifiable Black or African American group for unequal treatment.**

31. The intent of the State is to single out a racially identifiable Black group - voucher holders - for injury. The intent is proven by the circumstances giving rise to the Statute and the stark pattern of the consequences of the Statute.

32. The Statute singles out only one group's source of income - those whose "source of income to pay rent includes funding from a federal housing assistance program." Tex. Loc. Gov't Code § 250.007. The principal federal rental housing assistance program that is covered by the Statute is the federal Housing Choice Voucher program. The group singled out by the Statute for disadvantage, voucher holders, is, in the City of Dallas, 87% Black or African American. The group is 6% White non-Hispanic in the City of Dallas. 81% of the voucher holders in the Dallas metropolitan area are Black or African American. Only 10% of the voucher holders in the Dallas metropolitan area are White non-Hispanic. The singling out of the voucher participants is unexplainable on grounds other than race of the voucher tenants, Black or African-American.

33. The voucher program is publicly known to be predominantly Black. The households participating in the voucher program are subjected to various negative racial stereotypes. One example of  the stereotyped perception is the 2015 incident involving Black guests at a McKinney neighborhood pool. White residents taunted the Blacks as being "Section 8" and told them to leave the pool and the neighborhood and go back to their "Section 8" homes.

34. The group singled out by the Statute for disadvantage, voucher holders, is, in the Dallas area, segregated into predominantly minority, low income, high poverty census tracts, with low ranking schools, and marked by conditions of slum and blight and located in the City of Dallas. The group singled out by the Statute for advantage is landlords of multifamily complexes in predominantly White non-Hispanic areas who will continue to rent to a disproportionately large percentage of White tenants and a disproportionately small percentage of Black renters. The Statute makes housing unavailable because of race.

35. The Statute outlaws municipal protection for only one group and that group - voucher holders - is predominantly Black. The Statute does not prohibit the municipal protection for various groups that are not racially identifiable. Texas cities have passed ordinances that include other protections not found in the Fair Housing Act. For example, the City of Austin prohibits landlords from discriminating on the basis of student status, marital status, sexual orientation, gender identity, and age.[1] The City of Dallas prohibits housing discrimination based on "sexual orientation or gender identity and expression."[2] Groups classified by student status, marital status, sexual orientation, gender identity, and age are not disproportionately of any race.

36. The only group of voucher holders that the Statute allows municipalities to protect are military veterans. Tex. Local Gov't Code § 250.007 (b). This group is substantially more White non-Hispanic than the general population of vouchers. Military veterans in the State of Texas and in the Dallas metropolitan area are predominantly White non-Hispanic. 67% of the veterans in

---

[1] Austin City Code, § 5-1-51 - DISCRIMINATION IN SALE OR RENTAL OF HOUSING.

[2] Dallas City Code § 46-7

the State are White non-Hispanic, 13% are Black. 70% of the veterans in the Dallas metropolitan

area White non-Hispanic, 18% are Black. The Dallas Housing Authority vouchers specifically set

aside for military veterans are used by a 22% White non-Hispanic population. This is over three

times the percentage of all vouchers used by White non-Hispanic DHA voucher holders, 6%.

**The evidence proves disparate treatment, the presence of intent to perpetuate racial segregation, and the presence of intent to disadvantage a predominantly Black group in violation of 42 U.S.C. § 3604(a) and the Equal Protection Clause of the 14th Amendment to the U.S. Constitution.**

37. The circumstances of the enactment and the consequences of the Statute considered

with the additional circumstantial evidence prove racial purpose to perpetuate racial segregation

and to disadvantage a predominantly Black group. *Village of Arlington Heights v. Metropolitan*

*Housing Development Corp*. 429 U.S. 252, 266-268 (1977) articulates the framework for the

inquiry into discriminatory intent that is relevant to this case. The facts pleaded are consistent

with this framework and with the disparate treatment proof framework.

**The Statute has the effect of perpetuating racial segregation and singling out a disproportionately Black group for adverse treatment.**

38. The predominantly Black Dallas area voucher households are concentrated in

minority areas of the City of Dallas. The census tracts in the Dallas metropolitan area with

housing vouchers are, on average, 74% minority. The voucher households are racially segregated

into census tracts that are also low income and high poverty areas marked by conditions of slum

and blight.

39. Ordinances and laws prohibiting discrimination against voucher participants lessen

racial segregation and make more units available in White non-Hispanic areas to Black families

using vouchers. This result is caused by the racially segregated location of rental units operated

by landlords that do not discriminate against voucher households because of their status as participants in the voucher program.  The multifamily landlords with units that can be rented at voucher program rents and that do rent to voucher households are disproportionately located in predominantly minority areas. The multifamily landlords with units that can be rented at voucher program rents and that do discriminate against voucher households because of their status as voucher participants are disproportionately located in majority White non-Hispanic areas. If the City of Dallas passed a voucher protection law and there was landlord compliance with such a law, there would be more units that can be rented available in majority White non-Hispanic areas. If additional municipalities and counties in the Dallas area passed a voucher protection law, additional units would be made available assuming landlord compliance with such a law.

40. The State of Texas passed the challenged Statute to outlaw ordinances protecting voucher households from discrimination. The Statute permits multifamily landlords to deny housing to voucher tenants who can pay the rent, satisfy the tenant selection criteria, and for whom there are no legitimate business reasons to reject. By permitting the multifamily landlords in White non-Hispanic areas to discriminate solely on the basis of participation in the voucher program, the Statute permits the exclusion of the predominantly Black voucher households from White Non-Hispanic areas and causes the resulting perpetuation of racial segregation.

41.  Another discriminatory effect of the Statute is the singling out a disproportionately Black group - voucher households - for adverse treatment. Voucher holders in the City of Dallas are 87%  Black or African American. The group is 6% White non-Hispanic in the City of Dallas. 81% of the voucher holders in the Dallas metropolitan area are Black or African American. 10% of the voucher holders in the Dallas metropolitan area are White non-Hispanic. This group and

this group alone are denied municipal protection from housing discrimination based on

membership in the group. Municipal governments are not forbidden to pass laws protecting

students and other non-racially identifiable groups.

**The sequence of events leading to the decision reveals evidence of disparate treatment.**

42. The sequence of events leading up to the enactment of the Statute was the City of

Dallas and the City of Austin attempting to prohibit housing discrimination against voucher

households. Both cities were acting at least in part to prevent housing discrimination with racially

discriminatory effects. The suspect sequence is evidence of disparate treatment.

43. The City of Dallas signed a Voluntary Compliance Agreement with HUD on

November 5, 2014. The agreement required the City to consider enacting an ordinance protecting

voucher households from housing discrimination as part of the remedy for the City's violation of

Title VI of the 1964 Civil Rights Act. The specific violation to be remedied was the City

allowing private developers to prohibit the use of vouchers at City assisted projects. HUD,

November 22, 2013 Letter of Findings of Non Compliance with Title VI, pages 19 - 21. The

legislation that resulted in the Statute was filed the next month on December 19, 2014.

44. The City of Austin amended its Fair Housing Ordinance to protect voucher holders

from discrimination in the rental or sale of housing on December 11, 2014. The stated purpose

was to provide a remedy for the concentration of voucher households in only a few parts of the

City. The unwillingness of landlords to rent to voucher holders was cited as a cause of the

concentration. With the voucher protection ordinance, Austin intended to comply with its federal

statutory obligation to affirmatively further fair housing in its housing programs. The Austin

Apartment Association filed a lawsuit challenging the ordinance on December 12, 2014. A week

later, S.B. 267, the bill that became Tex. Local Gov't Code § 250.007, was filed for

consideration in the January 2015 Texas legislative session.

45. The City of Austin had previously amended its municipal fair housing ordinances to

include protections for non-racially identifiable characteristics including student status, marital

status, sexual orientation, gender identity, and age. These changes took place from 1982 through

2004. The Texas legislature took no action to outlaw these changes.

46. The difference in treatment by the Legislature between the racially identifiable group -

voucher holders - and the various non-racially identifiable groups given protection from

discrimination is evidence of disparate treatment on the basis of race.

**The standards requiring the State to avoid actions that perpetuate racial
segregation rather than integrate would have been expected to leave the municipal
authority to ban voucher discrimination intact.**

47. The departures from substantive standards that would have been expected to lead to a

decision contrary to the one reached - banning municipal protection from discrimination against

voucher households - are evidence of intentional segregation and discrimination.

48. The State of Texas has the constitutional obligation to avoid deliberate, willful, and

purposeful actions that perpetuate racial segregation. Part of this obligation is to determine

whether its actions do perpetuate racial segregation and if so, avoid those actions.

49. The State of Texas has accepted millions of dollars in federal Community

Development Block Grant funding from the U.S. Department of Housing and Urban

Development. In order to receive these funds, State officials certify that the State will

affirmatively further fair housing in its housing and urban development related activities. The

obligation requires the State to, at a minimum, have an institutionalized method to determine whether its housing and urban development related actions are perpetuating racial segregation. If inquiry shows that the State is perpetuating racial segregation, Texas would be expected to avoid the discriminatory action in order to affirmatively further fair housing.

50. The State's Analysis of Impediments to Fair Housing documents the existing racial segregation of housing vouchers in urban areas of the State. The Analysis of Impediments states that private landlord discrimination is a causal factor for the concentration of vouchers in minority areas.

51. The State did not take either the constitutional obligation to avoid perpetuation of racial segregation or the Fair Housing Act obligation to avoid perpetuation of racial segregation into account when it enacted the Statute.

52. The State's failure to take these obligations into account was not inadvertent or unknowing behavior. The State has forbidden landlord discrimination against voucher households when necessary to affirmatively further fair housing. In order to continue to receive federal funding for disaster recovery, the State of Texas imposed the obligation to accept vouchers on all owners of affordable multifamily rental housing units and owners of 20 or more single family or duplex private rental housing units receiving federal assistance under the Hurricane Relief Program. The purpose of the requirement was to affirmatively further fair housing pursuant to a compliance agreement between the State and HUD.

53. The State failed to follow the federally required interest in affirmatively furthering fair housing in its housing and urban development related activities. Had it done so, the Statute would not have been enacted. The State failed to follow its interest in complying with its

constitutional duty to avoid involvement in perpetuation of racial segregation. Had it been serving this interest, the State would not have interfered with the City of Dallas' implementation of the remedy for the City's Title VI of the 1964 Civil Rights Act violations.

**The facts prove a prima facie case of disparate treatment on the basis of race.**

54. ICP's voucher clients are predominantly Black. The City of Dallas became subject to a civil rights compliance agreement requiring the City to consider passing an ordinance making voucher discrimination illegal. The agreement was signed on November 5, 2014. ICP and its clients would have benefitted from the enactment of a City ordinance making voucher discrimination illegal because of the additional housing units that would have become available in majority White non-Hispanic areas.

55. The legislation introducing the Statute was submitted on December 19, 2014 and became effective September 1, 2015.

56. The Statute singles out a predominantly Black group - voucher households - for adverse treatment. The Statute has no effect on non-racially identifiable, non-Fair Housing Act protected characteristics that are protected from housing discrimination by municipal ordinances.

57. The Statute perpetuates racial segregation by outlawing municipal laws prohibiting voucher discrimination. These laws lessen racial segregation and make more units available in White Non-Hispanic areas to Black households using vouchers. The Statute prevents the operation of these laws and leaves the existing racial segregation in place.

58. The Statute prevents the City of Dallas from enacting the ordinance making voucher discrimination illegal which denies ICP and its clients the benefit of the units that such an ordinance would have made available to voucher participants.

59. The legal authority of the City of Dallas to prohibit housing discrimination on other non-racially identifiable grounds remained in effect. The City of Dallas passed an ordinance prohibiting housing discrimination on the grounds of gender identity and expression on November 15, 2015. The City of Dallas had prohibited housing discrimination on the grounds of sexual orientation on May 8, 2002.

**The two interests cited by the legislature for the enactment of the Statute are pretexts for racial discrimination.**

60. Instead of considering its interests in complying with its federal constitutional and statutory obligations, the State cited two irrelevant interests. Each was a pretext for perpetuating racial segregation.

61. The first interest was described as the need to clarify whether Section 214.903 of the Texas Local Government Code, prohibited cities from passing ordinances expanding fair housing protected classes. There was no objective need for the clarification. The second interest was described as the need to ensure that municipalities would not be able to require landlords to participate in a federal program which did not itself contain a mandatory participation requirement. The protection against discrimination on the basis of voucher status is not the same as an obligation to participate in the voucher program. There is no discrimination if the voucher holder is refused as a tenant because she cannot pay the rent or cannot satisfy the tenant selection criteria or poses more risk of non-payment or delay in payment than a non-voucher tenant.

62. With respect to the first State interest, there was nothing to clarify. Texas cities have previously passed and continue to pass ordinances expanding the classes protected by their fair housing ordinances. There is no reported Texas or federal case opinion interpreting the State law

-18-

providing for municipal fair housing ordinances as setting limits on the classes to be protected.[3]

*Austin Apartment Ass'n v. City of Austin*, 89 F. Supp. 3d 886, 892–94 (W.D. Tex. 2015), appeal

dismissed (Aug. 6, 2015). The bill sponsor's statement of the purpose of the bill that became the

Statute at issue was that the law had "been interpreted to prohibit cities from passing ordinances

expanding fair housing protected classes" had no support in cases or other authority.

63. The Statute does nothing to clarify the general issue whether municipal governments

may add groups to be protected from housing discrimination under the provision of Tex. Local

Gov't Code § 214.903 which authorizes municipal fair housing ordinances and remains

unchanged by and is not mentioned in Tex. Local Gov't Code § 250.007. The status of any of the

groups other than voucher families that were in municipal fair housing ordinances before the

Statute was passed is unchanged and un-clarified as to consistence with Tex. Local Gov't Code §

214.903.

64. The second interest asserted for the Statute is based on the fact that the federal

government does not make participation in the voucher program mandatory. This fact does not

support the Statute. HUD is the federal agency in charge of administering and interpreting the

federal housing voucher program. 42 U.S.C. § 1437f(o). HUD enacted a regulation that expressly

provides that nothing in the voucher program regulatory scheme was intended "to pre-empt

operation of State and local laws that prohibit discrimination against a Section 8 voucher-holder

because of status as a Section 8 voucher-holder." 24 C.F.R. § 982.53(d).

65. The asserted interest does not establish a connection between voluntary participation

in the voucher program and an ordinance prohibiting discrimination against a voucher household

---

[3] Tex. Gov't Code § 214.903.

solely because of being a voucher participant. There is no nexus. The prohibition against voucher

discrimination does not prevent a landlord from:

> • refusing to rent to a voucher household because the voucher program does not
>   meet the contract rent for the unit;
> • refusing to rent to a voucher household because the household does not satisfy
>   the landlord's tenant selection criteria; or
> • refusing to rent to a voucher holder because of other legitimate business reasons.

66. Any limitation on a landlord's decision whether or not to discriminate on the basis of

group characteristics is a limitation on the landlord's voluntary decision whether or not to rent to

that group. For example, the federal Fair Housing Act provisions limit the landlord's voluntary

decisions whether or not to rent to Blacks, Hispanics, women, families with children, Muslims,

or the handicapped. 42 U.S.C. § 3604(a), (f). The municipal restrictions on landlords' right to

avoid renting to persons with a variety of other characteristics such as student status, gender

identity, and age limit the landlord's voluntary choices about whether or not to participate in a

lease with those persons.

67. Any other State interests that are asserted after the initiation of this litigation as

reasons for the Statute are pretexts for discrimination.

**42 U.S.C. § 3604 disparate impact**

68. The policy set out in the Statute causes two discriminatory effects. The policy

perpetuates racial segregation by permitting landlords to discriminate against voucher

households. The policy causes adverse effects on a disproportionately Black group, voucher

households. Voucher holders in the City of Dallas are 87%  Black or African American. The

voucher households in the City of Dallas is 6% White non-Hispanic. 81% of the voucher holders

in the Dallas metropolitan area are Black or African American. 10% of the voucher holders in the

Dallas metropolitan area are White non-Hispanic.

69. The predominantly Black voucher households in the Dallas area are concentrated in minority areas of the City of Dallas. The average census tract in the Dallas metropolitan area with housing vouchers is 74% minority. The voucher households are racially segregated into census tracts that are also low income and high poverty areas marked by conditions of slum and blight. The multifamily landlords with units available at voucher program rents and that do rent to voucher households are disproportionately located in predominantly minority areas. Most of the multifamily landlords with units that can be rented at voucher program rents in White non-Hispanic areas refuse to rent to voucher households. The Statute permits this discrimination even when there is no legitimate business interest served. There is an unmet demand by voucher households for dwelling units in these areas. The Statute makes housing unavailable because of race.

70. Ordinances and laws prohibiting discrimination against voucher participants lessen racial segregation and make more units available in White non-Hispanic areas to Black families using vouchers. The State of Texas passed the challenged Statute to prohibit these ordinances. The Statute permits multifamily landlords to deny housing to voucher families who can pay the rent, satisfy the tenant selection criteria, and for whom there are no legitimate business reasons not to accept as tenants. By permitting the multifamily landlords in White non-Hispanic areas to discriminate solely on the basis of participation in the voucher program, the Statute permits the exclusion of the predominantly Black voucher households from White non-Hispanic areas and the resulting perpetuation of racial segregation.

71. The Statute singles out and disadvantages a predominantly Black group. Voucher

holders in the City of Dallas are 87% Black or African American and 6% White non-Hispanic. 81% of the voucher holders in the Dallas metropolitan area are Black or African American and 10% are White non-Hispanic.

72. To be eligible for the voucher program, a household's income may not exceed 50% of the area median family income for the county or metropolitan area in which the family chooses to live. In addition, a public housing authority administering a voucher program must provide 75% of its vouchers to applicants whose incomes do not exceed 30% of the area median income. 24 C.F.R. § 982.201(B).

73. The 2015 HUD Picture of Subsidized Household data for the Dallas-Plano-Irving, TX Metropolitan Division reports that the average voucher household income per year is $13,703 or 23% of local median household income. 94% of voucher holders are very low income (< =50%) and 73% are extremely low income (<=30%). 81% of the voucher households in the Dallas Metro Division are Black, 10% are non-minority.

74. The population eligible for a voucher because their incomes are less than 50% and 30% of area median family income is predominantly Black.

75. The American Community Survey 2013 5-year Estimates data shows the following for the Dallas-Plano-Irving, TX Metropolitan Division renter households:

• 47% of Black renter households have incomes below 50% of area median family income.

• 27% of White non-Hispanic renter households have incomes below 50% of area median family income.

• 29% of Black renter households have incomes below 30% of area median family

income.

• 14% of White non-Hispanic renter households have incomes below 30% of area median family income.

76. The Statute makes multifamily units unavailable to a population that is disproportionately Black or African-American households based on the percent of the Black or African American renter households that are income eligible for vouchers compared the percent of the White population that is income eligible for vouchers.

77. The population that the Statute permits to be excluded is the voucher population that, although less than 30% of area median family income, can afford the same market rents that the non-voucher population at 80% or greater of area median family income can afford. The voucher population can afford the rents because of the combination of their income and the rent subsidy from the voucher. The 80% or greater area median family income population can afford the rents because of their higher income. The voucher population excluded by the policy is 81% Black and 10% White non-Hispanic. The non-voucher, 80% or greater of area median family income population is 19% Black and 53% White non-Hispanic. The policy permitting discrimination against voucher households excludes a disproportionately Black population and selects a disproportionately White non-Hispanic population.

78. The Statute does not prevent municipalities from expanding protection against housing discrimination for groups that are not distinctly Black. Existing ordinances will continue to prohibit discrimination on the basis of student status, marital status, sexual orientation or gender identity and expression, and age. These characteristics are not shared disproportionately by any race.

79. The causal connection between the policy and the discriminatory effects is robust. The policy permits multifamily landlords in White Non-Hispanic areas to discriminate against voucher households who can pay the rent, satisfy the tenant selection criteria, and for whom there are no legitimate business reasons not to accept as tenants. Voucher discrimination is the common practice by landlords with multi-family units in White Non-Hispanic areas. Voucher discrimination by landlords renting units in non-White areas does not have the same effect.

80. The policy in the Statute is an artificial, arbitrary and unnecessary barrier to integrated housing that is not necessary to achieve any legitimate government interests.

81. The legislative history cites two interests that were asserted to be achieved by the policy. The facts set out in paragraphs 60 through 66 prove that the interests asserted were pretexts and not legitimate State interests. The policy does not achieve the State's legitimate interests in compliance with the U.S. Constitution and the Fair Housing Act.

82. Any substantial, legitimate, nondiscriminatory interests supporting the challenged policy could be served by other practices that have a less discriminatory effect. If there is an interest in not burdening landlords with only a single rental unit or only a small number of rental units, the State can require municipal voucher protection ordinances to exclude such landlords from coverage.

83. If there is a State interest in not subjecting landlords to the costs of delayed payments in excess of those costs that are caused by renting to non-voucher tenants, there are several less discriminatory alternatives to serve that policy that are less discriminatory than outlawing all voucher protection ordinances. ICP and the Dallas Housing Authority make available and pay landlord incentive or bonus payments in the amount of one month's rent. This bonus or incentive

payment may cover all or part of any additional costs incurred renting to voucher tenants.

84. ICP offers its sublease/guarantor program to Dallas area landlords. In 2014 ICP presented the Apartment Association of Greater Dallas (AAGD) with a proposal to negotiate with ICP for agreement on a sublease/guarantor model designed to eliminate the stated business reasons for refusing to negotiate with or rent to voucher households. The sublease/guarantor proposal included both financial incentives and favorable lease concessions for the Association's members to make units available for voucher families in White non-Hispanic areas. ICP negotiated with the leadership of the AAGD on the terms of the sublease/guarantor proposal. The President of the Association during the negotiations, Mr. Michael Clark, said the sublease/guarantor proposal has merit. Ms. Kathy Carlton, Director of Government Affairs for AAGD has encouraged AAGD members to look at the ICP sublease/guarantor proposal. Ms. Carlton stated the AAGD had worked with ICP to identify roadblocks to participation in the voucher program and that ICP had done a good job addressing those roadblocks. AAGD, Rooflines, April 2016, page 20.

85. There are other less discriminatory alternatives to outlawing ordinances or other laws that prohibit voucher discrimination. The State of Oregon permits municipal ordinances that prohibit voucher discrimination while providing landlords with a dedicated fund from which reimbursements can be paid for voucher related landlord costs. As of July 1, 2014, the State of Oregon expanded its source of income protections in state fair housing law to include income from Housing Choice Vouchers (HCV) or Section 8, or other local, state or federal programs. With this expansion, Oregon created the Housing Choice Landlord Guarantee Program to mitigate losses that landlords might experience from unpaid rent or other costs, if any, caused by

participation in the HCV program. Through the program landlords are entitled to up to $5,000 in reimbursement of such costs. As of March 31, 2015, seven claims have been paid for a total of approximately $31,000. This is a less discriminatory alternative that serves an interest in protecting landlords from financial losses, if any, caused by participation in the voucher program. The State of Texas could require municipal prohibition against voucher discrimination to include such a program funded by the municipality.

86. Marin County, California passed a similar Landlord Partnership Program before it passed its prohibition on discrimination against voucher families. The program provides coverage for potential financial risks that may be associated with the Section 8 program by providing compensation for a range of costs, including an increased or double security deposit, a loss mitigation pool, and vacancy loss coverage that would provide a month's rent payment during vacancy. This is a less discriminatory alternative that serves an interest in protecting landlords from financial losses, if any, caused by participation in the voucher program. The State of Texas could require municipal prohibition against voucher discrimination to include such a program funded by the municipality.

87. Other cities and states have laws that prohibit voucher discrimination.

**The Statute violates 42 U.S.C. § 3615.**

88. The Statute requires or permits a discriminatory housing practice in violation of the Fair Housing Act. As set out above, the Statute violates 42 U.S.C. § 3604(a).

89. The Statute requires municipalities to single out for adverse treatment only one group - voucher households. Voucher households are predominantly Black or African American in the City of Dallas and in the Dallas area.

90. The Statute permits municipalities to allow landlords to discriminate against voucher tenants even though such discrimination perpetuates racial segregation.

91. The Statute is a discriminatory housing practice that perpetuates racial segregation by making units unavailable because of race and violates 42 U.S.C. § 3604(a).

92. The Statute is invalid pursuant to 42 U.S.C. § 3615.

**The Statute is not supported by a rational relation to a legitimate State interest.**

93. The Statute singles out the status as a voucher participant for unequal treatment under municipal housing discrimination laws. The Statute prohibits protection for that status alone while all other characteristics may be the subject of municipal legal protection. The discrimination does not constitute a rational relationship with the two stated legislative ends - clarification of Section 214.903 of the Texas Local Government Code and preserving landlords' federal law status as voluntary participants in the voucher program.

94. The Statute does nothing to clarify the general issue whether municipal governments may add groups to be protected from housing discrimination under the provision of Tex. Local Gov't Code § 214.903. That Statute remains unchanged and is not mentioned in the Statute. The § 214.903 status of any of the groups other than voucher families that were in municipal fair housing ordinances before the Statute was passed is unchanged and un-clarified.

95. The second interest is based on the fact the federal government does not make participation in the voucher program mandatory. This fact does not support the Statute. HUD is the federal agency in charge of administering and interpreting the federal housing voucher program. 42 U.S.C. § 1437f(o). HUD enacted a regulation that expressly provides that nothing in the voucher program regulatory scheme was intended "to pre-empt operation of State and local

laws that prohibit discrimination against a Section 8 voucher-holder because of status as a Section 8 voucher-holder." 24 C.F.R. § 982.53(d).

96. There is no connection between the Statute and protecting landlords' legitimate interests in voluntary participation.

97. If a landlord has legitimate business reasons for not renting to a voucher household, then any reasonable prohibition against discrimination against voucher households will not affect the landlord's voluntary participation. If the voucher rent is not high enough to pay the contract rent, the landlord is not discriminating by refusing to rent to the voucher household. If the voucher household does not meet the landlord's legitimate, nondiscriminatory tenant selection criteria, the landlord is not discriminating by refusing to rent to the voucher household. If the housing authority's administration of the voucher is likely to cause delays that increase the landlord's uncompensated costs, the landlord is not discriminating by refusing to rent to the voucher household. If the landlord has legitimate business reasons for not entering into the specific contract and lease terms set out by the voucher program, the landlord is not discriminating by refusing to rent to the voucher household.

98. There are modifications to the voucher program and available third party provided resources that can serve legitimate business interests and obtain the dwelling unit for a voucher household. These modifications and resources are available in the Dallas area and are described in paragraphs 83 and 84 of this complaint. If any extra costs or risks to the landlord are eliminated, there is no legitimate interest in not renting to the voucher household. In these situations, the Statute has no rational relation to any legitimate State interests and does not comply with the rational basis required by equal protection.

**Claims for relief**

99. The Statute violates the disparate treatment standard under the Equal Protection Principle of the 14th Amendment to the United States Constitution and 42 U.S.C. § 3604(a) by intentionally singling out a racially identifiable Black or African American group for unequal treatment that makes housing unavailable because of race and by intentionally perpetuating racial segregation.

100. The Statute violates the disparate treatment standard under the Equal Protection Clause of the 14th Amendment to the U.S. Constitution by intentionally singling out a racially identifiable Black or African American group for unequal treatment and by intentionally perpetuating racial segregation. This claim is brought under 42 U.S.C. § 1983.

101. The Statute violates the disparate impact standard under 42 U.S.C. § 3604(a) by causing adverse effects that disproportionately and adversely affects a Black or African American group by making housing unavailable because of race. The Statute is an artificial, arbitrary and unnecessary barrier to integrated housing that is not necessary to serve any legitimate interests. There are less discriminatory alternatives to the interests asserted as justifications for the Statute.

102. The Statute violates the disparate impact standard under 42 U.S.C. § 3604(a) by perpetuating racial segregation. The Statute is an artificial, arbitrary and unnecessary barrier to integrated housing that is not necessary to serve any legitimate interests. There are less discriminatory alternatives to the interests asserted as justifications for the Statute.

103. The Statute violates 42 U.S.C. § 3615 as it is a State law that requires or permits actions that are a discriminatory housing practice under 42 U.S.C. § 3604(a) and is a discriminatory housing practice that perpetuates racial segregation in violation of 43 U.S.C. §

3604(a).

104. The Statute singles out the status as a voucher participant for unequal treatment under municipal housing discrimination laws. The Statute prohibits protection for that status alone while all other characteristics may be the subject of municipal legal protection. The discrimination does not constitute a rational relationship with any legitimate State interest and violates the Equal Protection Clause of the 14th Amendment to the U.S. Constitution.

**Prayer for relief**

105. Plaintiff seeks the following relief including such other affirmative action as may be appropriate under 42 U.S.C. § 3613(c)(1):

a) a declaratory judgment that the Statute violates 42 U.S.C. § 3604(a) and the Equal Protection Clause of the 14th Amendment;

b) a declaratory judgment that the Statute violates 42 U.S.C. § 3604(a) and is to that extent invalid under 42 U.S.C. § 3615.

c) an award of attorney fees, litigation expenses, and court costs; and

d) any other relief appropriate under the facts and law.

Respectfully Submitted,


/s/ Michael M. Daniel
Michael M. Daniel
State Bar No. 05360500
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: daniel.michael@att.net
Attorney for Plaintiff

Laura B. Beshara
State Bar No. 02261750
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: laurabeshara@swbell.net
Attorney for Plaintiff