IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE INCLUSIVE COMMUNITIES PROJECT, INC., | § § | |
| Plaintiff, | § § § | |
| VS. | § § | Civil Action No. 3:17-CV-0440-D |
| GOVERNOR GREG ABBOTT only in his official capacity as Governor of The State of Texas, and the CITY OF DALLAS, | § § § § § | |
| Defendants. | § § | |

MEMORANDUM OPINION
AND ORDER

This is an action by plaintiff Inclusive Communities Project, Inc. ("ICP") to invalidate Tex. Loc. Gov't Code Ann. § 250.007 (West Supp. 2017)—a statute that precludes Texas cities from prohibiting source of income discrimination in rental housing—and City of Dallas Code §§ 20A-3(21) & 20A-4(a)—an ordinance that prohibits source of income discrimination in housing except to the extent the ordinance itself is prohibited by § 250.007. Defendants are Governor Greg Abbott ("Governor Abbott") and the City of Dallas ("the City"). Concluding that ICP lacks constitutional standing to bring its claims and that the action against Governor Abbott is barred by the Eleventh Amendment, the court grants Governor Abbott's and the City's motions to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, denies as moot their Rule 12(b)(6) motions to dismiss for failure to state a claim, and dismisses this action without prejudice by judgment filed today.

# I

ICP sues Governor Abbott and the City, challenging a Texas state statute, Tex. Loc. Gov't Code Ann. § 250.007 (West Supp. 2017) ("the Statute"), and a City ordinance, City of Dallas Code §§ 20A-3(21) & 20A-4(a) ("the Ordinance"), both of which relate to the administration of the federal Housing Choice Voucher program, formerly referred to as "Section 8." Under the program, vouchers are provided to approved participants to enable them to financially supplement housing rental payments that they owe to private landlords. Because federal law does not mandate that landlords participate in the Voucher program, renters who seek to use program vouchers must find housing provided by landlords who will accept the vouchers in payment of rent. Although the Voucher program is federally funded, it is administered by local public housing authorities: in Dallas, the Dallas Housing Authority ("DHA").

In November 2014 the City entered into a Voluntary Compliance Agreement ("VCA") with the U.S. Department of Housing and Urban Development ("HUD") under which the City agreed that

> [t]he City Manager and City Attorney will formally introduce to the Dallas city council for a public meeting and adoption an *ordinance prohibiting source of income discrimination, including discrimination against Housing Choice Voucher holders*. The proposed ordinance shall provide for administrative enforcement with damages and penalties for noncompliance if permitted by Texas law. The parties agree that [this action] shall be complete when the Dallas city council formally convenes to publicly consider adoption of such an ordinance.

2d Am. Compl. ¶23 (emphasis added).

In December 2014 the City of Austin, Texas ("Austin") enacted its own ordinance that prohibited landlords from discriminating against prospective tenants on the basis of source of income. It defined "source of income" to include "housing vouchers and other subsidies provided by government or non-governmental entities." *Id*. at ¶ 26.

During the 2015 legislative session, the Texas Legislature enacted the Statute, which provides, in pertinent part:

> [e]xcept as provided by this section, a municipality or county may not adopt or enforce an ordinance or regulation that prohibits an owner, lessee, sublessee, assignee, managing agent, or other person having the right to lease, sublease, or rent a housing accommodation from refusing to lease or rent the housing accommodation to a person because the person's lawful source of income to pay rent includes funding from a federal housing assistance program.

Tex. Loc. Gov't Code Ann. § 250.007 (West Supp. 2017). According to the second amended complaint, the legislative record indicates that Texas legislators explicitly took "the City of Dallas obligation to consider a voucher discrimination ordinance and the City of Austin enactment of such an ordinance into consideration as factors supporting the enactment of the Statute." 2d Am. Compl. ¶ 28.

One year after Texas enacted the Statute, the City adopted the Ordinance, which provides:

(a) A person commits an offense if he, because of race, color, sex, religion, handicap, familial status, [or] national origin, or *source of income*:

(1) refuses to negotiate with a person for the sale or rental of a housing accommodation or otherwise denies or makes unavailable a housing accommodation to a person;

(2) refuses to sell or rent, or otherwise makes unavailable, a housing accommodation to another person after the other person makes an offer to buy or rent the accommodation; or

(3) discriminates against a person in the terms, conditions, or privileges of, or in providing a service or facility in connection with, the sale or rental of a housing accommodation.

City of Dallas Code § 20A-4(a) (emphasis added). Although the Ordinance prohibits discrimination based on source of income, the definition of the term "source of income" is explicitly made subject to the Statute's prohibitions. The Ordinance provides that "[s]ource of income means lawful, regular, and verifiable income from whatever source derived (including housing vouchers and other subsidies provided by government or non-governmental entities, child support, or spousal maintenance), *except as prohibited by Texas Local Government Code, Section 250.007, as amended*." City of Dallas Code § 20A-3 (21) (emphasis added).

According to the second amended complaint, the Dallas City Council simultaneously considered, but did not adopt, a second housing ordinance that did not reference § 250.007. In ultimately adopting the Ordinance, the City Council "acknowledged that the Statute controlled as a matter of law and prohibited enactment of an ordinance prohibiting voucher discrimination." 2d Am. Compl. ¶29.

ICP is a fair housing focused nonprofit organization that works with households seeking access to housing in predominantly "non-minority" locations in the Dallas area. In support of this mission, "ICP provides counseling, financial assistance, and other services to Black or African American households participating in" the Voucher program as administered by the DHA. 2d Am. Compl. ¶8. Although ICP's assistance is open to all DHA voucher participants, 94% of DHA voucher participants are non-White, and 86% are Black or African American. Moreover, the average demographic census tract in which a Dallas voucher tenant resides is 88% minority. Statewide statistics demonstrate that voucher tenants are disproportionately minorities and live in census tracts with disproportionately high levels of minorities.[1]

Contending that the Statute injures ICP and its clients, ICP brings this action against Governor Abbott, in his official capacity as Governor of Texas, and the City, seeking declaratory and injunctive relief based on federal statutory and constitutional claims asserted under 42 U.S.C. § 1983.

Against Governor Abbott, ICP alleges that the Statute "singl[es] out a racially identifiable Black or African American group for unequal treatment," in violation of the disparate treatment standard of the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. § 3604; that the Statute is a state policy that disparately impacts African

_____

[1]Although Texas' renter households are only 19% Black, the "Texas voucher population is 86% minority with 55% Black, Non-Hispanic tenants and 30% Hispanic tenants. The average percent minority census tract that a Texas voucher tenant resides in is 73% minority." 2d Am. Compl. ¶47.

Americans, in violation of 42 U.S.C. § 3604; that the Statute permits a discriminatory housing practice, in violation of 42 U.S.C. § 3615; that the Statute is not rationally related to a legitimate state interest, in violation of the Fourteenth Amendment's Equal Protection Clause; that the Statute is preempted by 42 U.S.C. § 5304(b)(2); and that the Statute violates the United States Constitution's Supremacy Clause. ICP seeks corresponding declaratory judgment under each of these claims.

Concerning the City, ICP alleges that, "by complying with the Statute, [the Ordinance] is perpetuating racial segregation and singling out a disproportionately Black group for" disparate treatment, in violation of the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. § 3604. 2d Am. Compl. ¶154. Based on the premise that the Ordinance "implements" the Statute, ICP also brings against the City the same claims under § 3604, § 3615, the Fourteenth Amendment, and the Supremacy Clause as it does against Governor Abbott. In addition to declaratory judgment, ICP seeks "an injunction requiring the City of Dallas to delete the phrase 'except as prohibited by Texas Local Government Code, Section 250.007, as amended[]' from the definition of Source of Income in the City of Dallas Fair Housing Ordinance." 2d. Am. Compl. ¶ 211.

There are three motions pending before the court: the City's motion to dismiss for failure to state a claim; the City's motion to dismiss for lack of jurisdiction; and Governor Abbott's motion to dismiss plaintiff's second amended complaint for lack of subject matter jurisdiction and failure to state a claim. ICP opposes the motions. The court has heard oral argument.

II

The court first considers Governor Abbott's and the City's motions to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction.

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). A Rule 12(b)(1) motion can mount either a facial or factual challenge. *See, e.g.*, *Hunter v. Branch Banking & Tr. Co.*, 2013 WL 607151, at *2 (N.D. Tex. Feb. 19, 2013) (Fitzwater, C.J.) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981)). When a party makes a Rule 12(b)(1) motion without including evidence, the challenge to subject matter jurisdiction is facial. *Id.* The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it "looks only at the sufficiency of the allegations in the pleading and assumes them to be true. If the allegations are sufficient to allege jurisdiction, the court must deny the motion." *Id.* (additional citation omitted) (citing *Paterson*, 644 F.2d at 523). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citations omitted).

III

The court begins by addressing whether ICP has constitutional standing to bring its claims against Governor Abbott and the City. Governor Abbott and the City maintain that ICP lacks standing because it has not alleged an injury-in-fact that is fairly traceable to

defendants' respective actions. The City also contends that ICP has not requested relief that would redress its injury-in-fact.

A

"[T]he requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). It is well-settled that "the irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. These elements are (1) an injury-in-fact that is concrete and actual or imminent, not hypothetical; (2) a fairly traceable causal link between the injury and the defendant's actions; and (3) that the injury will likely be redressed by a favorable decision. *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 167 (1997); *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009). These elements must be met because "[f]ederal courts do not render advisory opinions." *Life Partners, Inc. v. Life Ins. Co. of N. Am.*, 203 F.3d 324, 325 (per curiam) (5th Cir. 1999) (citing *United States v. Tex. Tech. Univ.*, 171 F.3d 279, 286 (5th Cir. 1999)).

A plaintiff "can meet the standing requirements when suit is brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, by establishing actual present harm or a significant possibility of future harm." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008) (quoting *Bauer v. Texas*, 341 F.3d 352, 357-58 (5th Cir. 2003)) (internal quotation marks and citation omitted). To obtain injunctive relief, a plaintiff must be "likely to suffer future injury." *City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983). "Past exposure to

illegal conduct does not in itself show a present case or controversy regarding injunctive relief[.]" *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974). The threat of future injury to the plaintiff "must be both real and immediate, not conjectural or hypothetical." *Lyons*, 461 U.S. at 102 (internal quotation marks omitted).

## B

The court turns first to the question whether ICP has demonstrated an injury that is traceable to either defendant.

### 1

"[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations incorporated). This requirement, however, "does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 456 (5th Cir. 2017) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). The traceability requirement "can be satisfied by showing that the defendant's acts have caused others to react in a way that injures the plaintiff." 13A Charles A. Wright, et al., *Federal Practice and Procedure* § 3531.5, at 372 (3d ed. West 2008).

### 2

Governor Abbott maintains that ICP lacks standing to bring claims against him in his official capacity because ICP has not alleged an injury-in-fact that is fairly traceable to him.

He contends that the Statute does not contain a specific provision for gubernatorial enforcement; that "ICP does not identify any action—or threat of action—taken by Governor Abbott" related to enforcing the Statute; and that, as a result, there is no fairly traceable causal link between ICP's alleged injury and the Governor. Gov. Abbott Mot. to Dismiss at 8.

ICP maintains that the second amended complaint plausibly pleads an injury traceable to Governor Abbott. As the injury-in-fact, ICP contends that the Statute prohibits "the City of Dallas . . . from affirmatively furthering fair housing by passing ordinances that protect voucher households from discrimination." P. Resp. to Gov. Abbott at 4. It maintains that these ordinances would otherwise make housing available in majority White areas, which in turn would reduce ICP's financial costs in assisting its voucher clients to find housing. ICP posits that this is an actionable economic injury.

ICP maintains that its injury is plausibly traced to the Governor. The second amended complaint focuses largely on how the Statute binds the City, which in turn allows landlords to continue to refuse to rent payments in the form of federal housing vouchers. ICP contends that the HUD findings and administrative requirements alleged in the second amended complaint plausibly demonstrate that available housing units would increase in White areas as a result of a municipal ordinance that prohibits source of income discrimination, but that such an ordinance is prohibited by the Statute. Without such a prohibition, ICP posits, Dallas landlords in majority White areas will continue to refuse to rent to persons who use federal housing vouchers; the housing supply for minority renters in affluent areas of Dallas will

decrease; and ICP's costs in assisting these renters in obtaining housing will increase as a result.

The court concludes that ICP's reasoning is misplaced. To establish standing to bring this suit against Governor Abbott, the key inquiry is not whether the injury may be traced to the Statute generally; instead, it is whether the injury can be fairly traced to Governor Abbott's conduct. *See Lujan*, 504 U.S. at 560. ICP contends that its injury can be traced to Governor Abbot's authority to "generally enforce this provision and other state laws or federal laws in his execution of the power to make and withhold grants to local governments." *Id.* at ¶48.

According to ICP, there are two potential sources of this enforcement power. First, Governor Abbott has a general duty to faithfully execute the laws. ICP asserts that Governor Abbott cited this duty when he conditioned Travis County's use of grant money awarded through the state Criminal Justice Division on the county's commitment to enforce federal immigration law. ICP maintains that Governor Abbott could do the same here, and condition the City's receipt of state funds on its compliance with the Statute.

Second, ICP contends that Texas law appoints the governor as the state's "chief planning officer," Tex. Gov't Code Ann. § 772.002 (West 2018), and provides that the governor "shall coordinate the actions of a local government participating in a federal financial assistance program," Tex. Gov't Code Ann. § 742.003 (West 2018). ICP alleges that "[t]hese specific duties provide the general authority and legal framework for the Governor of Texas to withhold funds or take other adverse actions against a city or county

that passed an ordinance in violation of the Statute." 2d Am. Compl. ¶53. ICP maintains that, as a result of these powers, Governor Abbott's possible enforcement of the Statute will prevent Dallas or "any other [c]ity from prohibiting voucher discrimination as a source of income discrimination." 2d Am. Compl. ¶63. The court disagrees.

Courts have found traceability where the public official has taken, or has threatened, actions to enforce a statute alleged to be unconstitutional. *See, e.g., K.P. v. LeBlanc*, 627 F.3d 115, 123-24 (5th Cir. 2010) (finding traceability where medical board refused to cap doctors' potential malpractice liability related to abortion procedures in accordance with challenged statute); *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 514 (5th Cir. 2017) (finding harm was traceable to defendant officials because officials set rates, resolved fee disputes, and enforced billing rules in accordance with challenged statute). A plaintiff's injury can also be traced to an official who is charged with the authority to enforce, or has "definite responsibilities" related to, the statute in question.[2] *K.P.*, 627 F.3d at 124; *see, e.g., Campaign for S. Equal. v. Miss. Dep't of Human Servs.*, 175 F.Supp.3d 691, 707 (S.D. Miss. 2016) (holding that same-sex couples challenging adoption ban had standing against Department of Human Services Executive due to department's control over foster care and private adoption process). These qualities demonstrate that a particular officer has the "coercive power" to cause the alleged injury-in-fact. *See Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc). But ICP cites no case holding that an

---

[2]The Fifth Circuit has stated that "[e]nforcement typically involves compulsion or constraint." *K.P.*, 627 F.3d at 124 (internal quotation marks and citations omitted).

official has a "determinative and coercive effect" on a plaintiff's injury when that official has only "general enforcement powers" that are not tied to the statute in question and has taken no action to enforce, nor has threatened to enforce, the statute in question, which are the circumstances here.

As the source of enforcement authority that would tie Governor Abbott to the Statute, ICP only points to his general duty to uphold the laws. But courts have declined to find traceability based solely on such authority; otherwise, a government official could be sued by any party seeking to challenge any state law. *See Calzone v. Hawley*, 866 F.3d 866, 870 (8th Cir. 2017) (holding that "the governor ha[d] not caused any injury" to plaintiff because, in part, "[n]o provision of [the vehicle inspection statute] or the statutes defining his executive authority specifically authorize[d] the governor to enforce vehicle inspection statutes."). Here, the Statute itself provides no enforcement role for the governor. Moreover, neither § 772.002 nor § 742.003 imposes a duty to enforce, or confers responsibilities under, the Statute. That the governor is the "chief planning officer" of the States of Texas relates to his authority to coordinate state applications for federal grants and loans. *See generally* Tex. Gov't Code Ann. § 772 *et seq*. (West 2018). These provisions of Texas law impose no specific charge related to the Statute, nor does the Statute itself relate to the governor's duties of the "chief planning officer." Accordingly, these laws do not confer authority to enforce laws against home rule cities, let alone to enforce the statute in question here. *Cf. OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) (holding that injury from Texas election law was traceable to Secretary of State because Secretary specifically "is instructed

by statute to 'obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code'" (citation omitted)).  And although the governor may coordinate the actions of localities participating in a federal financial assistance program,[3] the governor must coordinate these actions in accordance with specified rules.  *See* Tex. Gov't Code Ann. § 742.003(b)-(c) ("The governor or the designated state agency shall adopt rules to coordinate the actions of local governments participating in federal financial assistance programs. . . . A rule adopted under this section must be approved by the attorney general and filed with the secretary of state.").  Section 742.003 does not link potential rules to the Statute, and ICP has alleged no rules that would relate to compliance with the Statute.  As a result, these provisions, as alleged, do not provide Governor Abbott with the authority or "definite responsibilities" to enforce the Statute.

Moreover, ICP alleges no facts that would permit the reasonable conclusion that Governor Abbott has taken any action related to the Statute.  ICP repeatedly cites Governor Abbott's threat to withhold Criminal Justice Division grant funding from Travis County if the county sheriff refused to enforce federal immigration law.  In that instance, Governor Abbott cited as justification only his general duty to enforce the laws.  ICP alleges that if Governor Abbott can invoke his general authority to uphold the laws as the basis to compel a county to enforce federal law, he can use the same authority to force the City to comply with the Statute.  But Governor Abbott's actions regarding Travis County are wholly

_____

[3]A federal financial assistance program "means a program established by federal law or rule that provides a grant or loan to a local government."  Tex. Gov't Code § 742.002.

unrelated to the Statute, which is the law challenged in this case. That Governor Abbott would act similarly to enforce the Statute is speculative and therefore insufficient to establish traceability. The "plaintiff's burden of demonstrating causation is not satisfied when '[s]peculative inferences are necessary to connect [its] injury to the challenged actions.'" *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1157 (10th Cir. 2005) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45-46 (1976)).

ICP has failed to trace any injury to Governor Abbott because—accepting ICP's factual allegations as true—the Statute's coercive effect on ICP's injury-in-fact does not turn on the governor's actions. Instead, it turns on actions of the Texas Legislature and of individual Dallas landlords. As a home rule city, the City "possess[es] the power of self-government and look[s] to the *Legislature* . . . for limitations on [its] authority." *BCCA Appeal Grp., Inc. v. City of Houston*, 496 S.W.3d 1, 7 (Tex. 2016) (emphasis added) (citing Tex. Loc. Gov't Code Ann. § 51.072(a); *Dall. Merch.'s & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 490-91 (Tex. 1993)). The Texas Constitution provides that no municipal ordinance "shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the *Legislature* of this State." Tex. Const. art. XI, § 5(a) (emphasis added). Here, by enacting the Statute, the Texas Legislature chose to expressly abrogate the authority of all Texas municipalities and counties to adopt or enforce a ban on housing discrimination based on source of income.

Moreover, it is private Dallas landlords who are refusing to rent to housing voucher users, and thereby increasing ICP's costs. Private litigants can sue in Texas courts to

invalidate Texas city ordinances that conflict with state law.  *See, e.g., BCCA Appeal Grp.*, 496 S.W.3d at 20 (group of businesses successfully challenged Houston's air quality ordinance as preempted by state law); *Dall. Merch.'s & Concessionaire's Ass'n*, 852 S.W.2d at 490-91 (holding that city ordinance prohibiting sale of alcoholic beverages within 300 feet of residential area was preempted by Texas Alcoholic Beverages Code).   Therefore, regardless of Governor Abbott's action or inaction, a private landlord can challenge in state court any municipal attempt to enforce a requirement that landlords accept renters that use housing vouchers.  In this way, ICP has "confused the *statute*'s immediate coercive effect . . . with any coercive effect that might be applied by the *defendants*."  *Okpalobi*, 244 F.3d at 426 (emphasis in original).

Under the facts alleged in the second amended complaint, ICP has failed to adequately plead that its injury-in-fact is traceable to Governor Abbott.

3

The City maintains that ICP's alleged injuries are not traceable to the Ordinance or to any of the City's actions.  It contends that the Ordinance does not implement or enforce the Statute; that the Ordinance prohibits voucher discrimination; that ICP judicially admits that its injuries cannot be traced to the City; that the Ordinance could not cause any of ICP's injuries, whether it expressly recognized the Statute or not; and that ICP's injuries can only be traced to discriminating landlords or the State.  ICP maintains that its injuries are, in fact, traceable to the City's decision to incorporate the language of the Statute into the Ordinance, thereby "implementing" the Statute.  "The complaint shows that municipal action, enacting

the [O]rdinance, was the moving force behind the injury." P. Resp. to City 2.

The court holds that ICP has failed to demonstrate that its injury-in-fact is traceable to the City. ICP contends that the City is "enforcing or implementing" the Statute by referencing it in the Ordinance. It posits that "the municipal implementation of an unconstitutional state law does not exempt a city from liability, it makes the city a partner and participant in the discrimination." *Id.* at 9. But ICP fails to allege any facts that indicate how—in light of the Statute—enacting any type of ordinance affects Dallas landlords' ability to refuse to accept federal housing vouchers. In fact, once the Texas Legislature enacted the Statute, ICP's alleged injury-in-fact existed regardless of the City's course of action. The Statute prevents the City from either "adopting or enforcing" a prohibition against source of income housing discrimination. *See* Tex. Loc. Gov't Code Ann. § 250.007. Even if the City had adopted a version of the Ordinance that did not reference the Statute, and had attempted to enforce that ordinance, any landlord facing an enforcement action could have successfully challenged the action in Texas court as preempted by state law. *See BCCA Appeal Grp., Inc.*, 496 S.W.3d at 20. Regardless whether the Ordinance acknowledges it, the Statute divests the City of the power to prohibit source of income discrimination in housing. *See* Tex. Const. art. XI, § 5(a). Landlords could continue refusing to accept federal housing vouchers in payment of rent, and ICP's alleged injury would continue. ICP's alleged injury would therefore have occurred regardless whether the City adopted an ordinance that explicitly contradicted the Statute, adopted this particular Ordinance, or did not adopt any prohibition against source of income discrimination. The lack of impact of the City's choice

demonstrates that ICP's injury is caused by the Statute and by the practices of Dallas landlords, and is not traceable to the City's enactment of the Ordinance.

The cases ICP cites in which city authorities enforced a state law do not remedy this flaw in the second amended complaint. In each case, the municipality retained coercive power that could be traced to the plaintiff's injury. *See Bd. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404-05 (1997) (city hired and supervised police officer who on multiple occasions used excessive force); *Owen v. City of Independence, Mo.*, 445 U.S. 622, 650 (1980) (city manager fired plaintiff chief of police without notice of reasons or required hearing); *Robinson v. State of Fla.*, 378 U.S. 153, 156 (1964) (state policy placed "burdens upon any restaurant which serve[d] both races, burdens bound to discourage the serving of the two races together"); *Peterson v. City of Greenville, S.C.*, 373 U.S. 244, 248 (1963) (city ordinance forbidding restaurants from sitting customers of different races in the same room "compell[ed] persons to discriminate against other persons because of race"); *Cooper v. Aaron*, 358 U.S. 1, 16 (1958) (school board, as agents of the state, delayed integrating schools in compliance with Supreme Court order).

But here, ICP has failed to adequately plead that the adoption of the Ordinance had such a determinative or coercive effect. Once the Legislature enacted the Statute, the City could not countermand the landlords' ability to decline to accept housing vouchers as rent payments. Although the court does not foreclose the possibility that there may be standing where the municipality's passivity can be traced to the injury-in-fact, as the foregoing analysis demonstrates, the City's referencing the Statute in the Ordinance did not have a

"determinative or coercive effect"—directly or indirectly—on ICP's alleged injury. Because ICP's injury occurs regardless whether the Ordinance references the Statute, the Ordinance cannot "implement" the statute in a way that satisfies the causation requirement of constitutional standing.

The court therefore holds that ICP is unable to establish that the City's challenged action of passing the Ordinance, and not the actions of some third party—namely, the Texas Legislature passing the Statute and the Dallas landlords refusing to accept renters using housing program vouchers—caused ICP's injury.

## C

The City also maintains that the relief ICP requests will not redress its injury.

### 1

To meet the redressability prong of standing, the plaintiff must show a "substantial likelihood that the relief requested will redress the injury." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (quoting *Simon*, 426 U.S. at 45). A plaintiff must demonstrate redressability for each form of relief sought. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

### 2

ICP's alleged injury-in-fact is that the Statute and the Ordinance make it "more difficult and more expensive for ICP to obtain housing for its voucher clients in areas of low poverty and high opportunity" because landlords in these areas discriminate on the basis of federal housing voucher use. P. Resp. to City 6. For this injury to be remedied, the requested

relief must lead to a "substantial likelihood" that Dallas landlords will stop such discrimination—i.e., will accept program vouchers in payment of rent. ICP seeks a declaratory judgment that the Statute violates the Constitution and the Fair Housing Act, and an injunction requiring the City to remove the Ordinance's reference to the Statute. Should the court grant this relief, the Ordinance's language would prohibit discrimination on the basis of source of income, which would include the use of federal housing program vouchers to pay rent. Moreover, as a party to this lawsuit, the City would be bound by the court's judgment. ICP maintains that this will remedy its injury. The court disagrees.

ICP presupposes that, with the requested injunction and declaratory relief, the City would be free to enforce against Dallas landlords a prohibition against source of income discrimination. But neither an injunction nor a declaratory judgment against the City would likely abate the landlords' current refusal to accept housing program vouchers or prevent them from doing so in the future. This is so because neither form of relief would preclude landlords from relying on the Statute. As the court has explained above, even if the Ordinance removed the reference to the Statute, landlords who are not parties to this lawsuit could still invoke the Statute to invalidate the Ordinance as contrary to state law.

The lack of redressability in this case resembles *Lewis v. Bentley*, 2017 WL 432464, at \*5-6 (N.D. Ala. Feb. 1, 2017), in which the plaintiffs sued the Alabama Attorney General and City of Birmingham, Alabama officials seeking to invalidate an Alabama statute that had overridden a Birmingham ordinance increasing the city's minimum wage. The plaintiffs sought, *inter alia*, an injunction ordering the Attorney General to inform the public that the

Alabama statute was unconstitutional and requiring the Birmingham officials to enforce the city's minimum wage ordinance. *Id.* at *6. The court held, however, that there was no redressability against either defendant because the challenged Alabama Statute "will be in force regardless of any action this court may order [the Attorney General] or the City Defendants to undertake." *Id.* at *5. The court explained that

> as a matter of law and logic, nothing this court could order [the Attorney General] or the City Defendants to do will affect Plaintiffs' wages. Plaintiffs' employers set those wages, and it is the courts who will determine whether there is any violation of law with respect to the setting of those wages.

*Id.* at *6. Likewise, in order for ICP to obtain the relief that redresses its claimed injury in this case, it must overturn the Statute: a form of relief not available in a suit against the City.

It is true that the court need not resolve "every injury" for there to be redressability. *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Indeed, courts have found standing where they were able to redress at least part of the injury. Here, however, ICP's injury is tied to the landlords' continued refusal to accept housing program vouchers as a form of payment for rent—an injury that cannot be redressed by anything the court could order the City to do.

The court therefore concludes that ICP has failed to demonstrate that its injury would be "redressed by a favorable decision" against the City. *See Lujan*, 504 U.S. at 561.

IV

The court next addresses whether, even if there is standing, Governor Abbott is entitled to Eleventh Amendment immunity.[4]

A

"The Eleventh Amendment grants a State immunity from suit in federal court by citizens of other States, and by its own citizens as well." *Lapides v. Bd. of Regents*, 535 U.S. 613, 616 (2002) (citations omitted); *see also Union Pac. R. Co. v. La. Pub. Serv. Comm'n*, 662 F.3d 336, 340 (5th Cir. 2011). Ordinarily, when public employees are sued in their official capacities, they are entitled to the same Eleventh Amendment immunity enjoyed by the state, because an official capacity claim is asserted "against the official's office" and "is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citations omitted).

In *Ex parte Young*, however, the Supreme Court "recognized an important exception to this general rule: a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). In other words, "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will*, 491 U.S. at 71 n.10

---

[4]Because "there is significant overlap" in the analysis of constitutional standing's fairly traceable causal connection requirement and *Ex parte Young*'s applicability, *see Air Evac EMS, Inc.*, 851 F.3d at 513-14, the court will address both issues.

(quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).

Under *Ex parte Young* and its progeny, Eleventh Amendment immunity does not bar suits "brought against individual persons in their official capacities as agents of the state, [where] the relief sought [is] declaratory or injunctive in nature and prospective in effect." *Aguilar v. Tex. Dep't of Crim. Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998) (citation omitted). Thus "to avoid an Eleventh Amendment bar by means of *Ex parte Young*, 'a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Cantu Servs., Inc. v. Roberie*, 535 Fed. Appx. 342, 344-45 (5th Cir. 2013) (per curiam) (alteration in original) (quoting *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 131 (2011)).

At the same time, the state officers also must "have 'some connection with the enforcement of the act' in question or [are] 'specially charged with the duty to enforce the statute' and [are] threatening to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (alterations in original) (quoting *Ex parte Young*, 209 U.S. at 157, 158; *Okpalobi*, 244 F.3d at 414-15 (plurality opinion)[5]). This connection may be found in either the "general law" or the specific law in question. *K.P.*, 627 F.3d at 124. "The required 'connection' is not 'merely the general duty to see that the laws of the state are

---

[5]*Okpalobi* presented issues of both standing an Eleventh Amendment immunity. A majority of the *en banc* court agreed there was no standing in the case. A plurality—seven of the fourteen judges—also joined an opinion holding that *Ex parte Young* did not provide an exception to Eleventh Amendment immunity. This court will specify when it is citing the *Okpalobi* plurality opinion.

implemented,' but 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Morris*, 739 F.3d at 746 (quoting *Okpalobi*, 244 F.3d at 416 (plurality)); *see also Yu v. Perry*, 82 Fed. Appx. 993, 994 (5th Cir. 2003) (per curiam); *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014).

B

Governor Abbott maintains that the *Ex parte Young* exception to the Eleventh Amendment is inapposite. He contends that he does not have a particular duty to enforce the Statute; that he has not demonstrated willingness to enforce the Statute; and that he has neither commenced nor threatened to commence enforcement proceedings under the Statute.

ICP contends that the *Ex parte Young* exception permits this suit against Governor Abbott. It posits that § 772.002 and § 742.003 create a framework that connects Governor Abbott to the Statute, and that Governor Abbott has demonstrated the willingness to use his general enforcement powers to enforce statutes that otherwise have no specific provision that provides the Governor with enforcement powers.

C

The court holds that ICP has failed to establish that the *Ex parte Young* exception applies. Governor Abbott is therefore entitled to Eleventh Amendment immunity from suit.

ICP points to no duty of Governor Abbott to enforce the Statute beyond that found in his general duty to uphold the laws. As the analysis above demonstrates, neither § 772.002 nor § 742.003 provides a duty to enforce the Statute. *See supra* § III(B)(2). They concern separate responsibilities regarding applications for federal grants, unrelated to the terms of

the Statute. It is clear that the general duty to uphold the laws is alone insufficient to establish that Governor Abbott has "some connection" to the enforcement of the statute. *Air Evac EMS, Inc.*, 851 F.3d at 517 (citing *Morris*, 739 F.3d at 745-46) ("For example, a state governor with a broad duty to uphold state law is not a proper defendant.").

Moreover, ICP has failed to establish that Governor Abbott has demonstrated a willingness to enforce the Statute. ICP attempts to point to Governor Abbott's dispute with Travis County and his willingness to enforce federal immigration law in that circumstance. But the test is not whether Governor Abbott has demonstrated his willingness to enforce federal immigration law or even the laws generally; it is whether Governor Abbott has demonstrated a willingness to enforce "the statute in question." *Morris*, 739 F.3d at 746. Although courts have not established a definition for "demonstrated willingness," they have applied *Ex parte Young* where the official has actually enforced or threatened to enforce the statute on others, or has made statements indicating that he was willing to enforce the statute. *See, e.g.*, *Hall v. Louisiana*, 974 F.Supp.2d 978, 990 (M.D. La. 2013) (challenging "Judicial Election Plan, as written, maintained, and enforced, and presently implemented by the Secretary of State") (internal quotation marks and modification omitted); *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1339-40 (11th Cir. 1999) (addressing constitutional challenge to statutes imposing penalties for performing certain types of abortion procedures, where appellants admitted intent to enforce statutes in the future). In contrast, ICP has not alleged any facts that indicate Governor Abbott has commented on, praised, or otherwise demonstrated any willingness to enforce the Statute against a Texas municipality. Without

either a sufficient duty to enforce the Statute or a demonstrated willingness to enforce the Statute, Governor Abbott does not have "some connection" to its enforcement, as required.

Separately, Governor Abbott maintains that *Ex parte Young* may only apply if he has commenced or threatened to commence proceedings enforcing the Statute. Indeed, many courts—including the Fifth Circuit plurality in *Okpalobi*—have concluded that an official must enforce, or threaten to enforce, the challenged law for the *Ex parte Young* exception to apply. *See Ex parte Young* 209 U.S. at 156 ("[O]fficers of the state . . . who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act . . . may be enjoined by a Federal court of equity from such action."); *Okpalobi*, 244 F.3d at 416 (plurality); *281 Care Comm. v. Arneson*, 766 F.3d 774, 797 (8th Cir. 2014) ("The *Ex parte Young* exception only applies against officials who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act[.]") (internal quotation marks omitted); *Long v. Van de Kamp*, 961 F.2d 151, 152 (9th Cir.1992) (per curiam) ("Absent a real likelihood that the state official will employ his supervisory powers against plaintiffs' interests, the Eleventh Amendment bars federal court jurisdiction."); *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 438 (6th Cir. 2000) ("The *Ex parte Young* doctrine does not apply when the defendant official has neither enforced nor threatened to enforce the statute challenged as unconstitutional."). Governor Abbott notes that ICP has alleged no facts indicating that he has enforced or threatened to enforce the Statute. Thus to the extent that this is a requirement in the Fifth Circuit, ICP has failed to plead facts that meet

it as well.

The court therefore holds that the *Ex parte Young* exception does not permit ICP's instant suit against Governor Abbott.

*    *    *

For the reasons explained, the court grants Governor Abbott's and the City's Rule 12(b)(1) motions, denies their respective Rule 12(b)(6) motions without prejudice as moot, and dismisses this action without prejudice by judgment filed today.

**SO ORDERED**.

May 29, 2018.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE